Ewing, C. J.
The controversy in this case is between two execution creditors, each claiming the proceeds of the sales of the goods and chattels of their debtor. The sales were made under both executions, the one of which was an alias fieri facias in favor of Sterling delivered to the sheriff in the afternoon of the 26th of October, 1829, and the other was a fieri facias in favor of Hunt delivered to the sheriff after-wards in the evening of the same day. Hunt insists that the execution of Sterling is to be postponed until his execution, though second in delivery, is first satisfied; because acts done by Sterling, not indeed fraudulent in design or intent, nor involving moral turpitude, are .nevertheless fraudulent in legal contemplation, or in other words, sufficient to-postpone the first, and entitle the second execution to priority.
. The property levied on was advertised for sale under both executions, in February, 1830, and an adjournment, in con *331 sequence of tlie sickness of the sheriff, then took place against the directions of Hunt, and without the consent of Sterling, until a day in March, when the sale was made.
The judgment in favor of Sterling was entered in May, 1826, and a fieri facias, then delivered to the former sheriff, was levied on the same goods and chattels. He claims, however, no efficacy from this execution and levy, but rests his right to the proceeds of the sale upon ,the alias execution already mentioned.
On the part of Hunt, it is insisted that a delay took place under the fieri facias in favor of Sterling, by an agreement for that purpose, made between him and the debtor, Van Oleve, amounting to legal though not actual fraud. And if the question was between the original execution and the execution of Hunt, the effect of this delay might be important to examine; but let it be admitted that full effect is given to the alleged legal fraud, and that the lien of the first execution is thereby destroyed, or that it must stand postponed to any subsequent fair execution, the controversy before us is not thereby closed, for as already observed, the claim on the part of Sterling is not *made under the first execution, and he requires no more than that he should be considered to have issued execution on his judgment on the 26th day of October, 1829. Nevertheless, this previous transaction is a proper subject of scrutiny. If in presents the naked fact of delay, it will be unimportant, as tho effect of delay, where no obstacle intervenes, is, at the most, to destroy merely as against a subsequent execution, the lien of tho prior one. Rut if the transaction evinces a design to set up, or keep on foot, an execution to cover the property of the debtor for his use, or to delay or defraud other creditors, it may be necessary to inquire what effect it may produce on the alias execution.
After the first execution was put into the hands of the officer and a levy made, “ the plaintiff agreed with the defendant to suffer the goods to remain in the possession of *332 the latter until the first day of April, 1829, and subsequently agreed to extend the time until the first day of April, 1830, in consideration that the defendant would pay to the plaintiff a rent therefor equivalent to their being kept in good order, and of the same value as before the levy.” And the goods and chattels, which consisted entirely of household furniture, did remain, as before, in the occupation of the defendant. In this transaction, I can discern nothing beyond a delay for the relief of the debtor, but without any design to injure or defraud others. The debtor is not to dispose of the goods as he may think proper without control or account. For even their very deterioration, their natural wear and decay, is to be made good. The interest on the debt would indeed accumulate'against them, but in every other respect they are to be made as sufficient to answer the claim of the plaintiff as at the time of the levy. .This arrangement was therefore not to the injury or prejudice, but rather to the benefit, of any other creditor. And most clearly does not evince a design to cover the property, or to protect it from the reach of others. This case has scarcely any feature in common with those of Matthews v. Warne, and Williamson v. Johnson. In the former, the debtor was allowed “ to exercise full dominion, without accountability, over all the provisions of his store, the furniture of his house, the crops and stock of his farm, the capital stock of a large tannery and of a shop for manufacturing leather into sadlery *and harness, to kill beeves, sheep and hogs, consume the way going crops of his farm, sell the horses, cattle and stock of a large farm and put the money in his pocket.” In the latter, after years of delay, in which the debtor was permitted to use and consume the goods, and in some instances to sell them, a sale was made impelled by the exigency of another execution, at which the creditor outbid all others and purchased every thing, and then suffered all to remain as before in the hands of the debtor without any engagement to compensate for their use, or, in any event, to deliver them up. *333 In the present case, I find nothing beyond the mere delay, and it is not necessary now to examine the question whether this alone will postpone an execution or destroy its lien in New Jersey, because, as already remarked, no lien or preference is claimed for the execution under which the delay occurred. In these previous transactions, there is then nothing to sustain the claim for prior satisfaction made by the second execution creditor.
This claim is farther sought to be supported by a transaction subsequent to the delivery of the two executions in question. On the 28th of October, 1829, an agreement was made between the sheriff and certain friends of the debtor, which was endorsed on an inventory of the goods, to the following effect: “ In consideration of the above goods and chattels being permitted to remain in the custody of the defendant, and a postponement of the sale thereof by virtue of the above stated execution until the first day of April next, we whose names are hereunto subscribed, jointly and severally promise and bind ourselves to deliver up the same to the sheriff on that day free from all rents.” The state of the case before us shows there was at that time about §300 of rent due and in arrear and consequently chargeable upon the goods, which at sale.brought §574.73. This agreement was made with the consent of Sterling. This consent was, however, afterwards withdrawn, and a writ of venditioni exponas issued by him after the adjournment and before the sale; the advertisement having been made by the sheriff under both executions. In this transaction I can discover neither actual nor even legal fraud on the part of the first creditor. An arrangement made by the sheriff ought not to be allowed to prejudice him, especially as the proceeds of the sale are not paid over or ^parted with, by the sheriff, but are under our control so as to be disposed of wherever they lawfully belong. The creditor, however, consented. But this consent can be no proof of fraud. It was to produce a valuable effect to all who were interested *334 in the proceeds of the property levied on, to clear it of a heavy amount of rent, and bring the whole avails to the satisfaction of the creditors. And this consent was withdrawn even at the loss of the removal of this incumbrance-of the rent when it was discovered it could not be persevered in with safety.
But it is said here was a consent to a delay on the part of the creditor, and the broad ground is assumed, and contended for, by the counsel of the second creditor which was stated by Judge Washington, in Berry v. Smith, 3 Wash. C. C. R. 60, that any delay, however short, produced by the order or consent of the creditor, deprives the execution of its force and effect until restored by a countermand, and if, in the meantime, a second execution is taken out and levied, the former must be postponed. I do not hold the doctrine here laid down to be the law of New Jersey. It has not been recognized by our courts, nor sanctioned by our customs, nor adopted in our practice, nor is it consistent with the circumstances of our people, or the current of business and dealings in our community. The true doctrine was, in iny opinion, laid down by C. J. Kirkpatrick, in delivering the opinion of this court, in Casher v. Peterson. “ In this country, it has not been the custom, nor is it necessary that the goods should be actually removed by the officer. They are left' in the hands of the defendant at his request, and for his benefit and accommodation, and he must be considered as the agent and his house the store house of the officer for this purpose. If the execution should not be pursued and a subsequent one be levied on the same property, then it will always be a question whether 'the first was kept up merely by color, and for fraudulent purposes; and if so, the last shall prevail, but if otherwise, the goods and chattels shall be holden by the first levy.” The rule of law and policy, as it respects our state, is here plainly pointed out, together with the proper and legitimate topics of inquiry.
Was then the first execution in the present case, that is to say, the alias fieri facias of Sterling kept up merely by *335 color, and *for fraudulent purposes? I cannot say so. The goods, therefore, should be holden by the first levy.
According to the stipulation in the case, let the sheriff pay the money to Thomas 0. Sterling.
Ford, J. Thomas 0. Sterling delivered an execution at his suit against J. W. Yan Gleve, to the sheriff of the county of Hunterdon, on the 18th day of May, 1826, and had it levied upon his goods and chattels. He then agreed to suffer the property levied on, to remain in the hands of the debtor without a sale, until the first of April, 1829. He subsequently agreed to extend the said time of delay, till the first of April, 1830, in consideration of the debtor’s agreement to allow a rent for the use of the property, equivalent to keeping it in as good order, and of as good value, during the time of delay, as it was at the time of the levy. Afterward, on the 26th of October, 1829, he delivered an alias fi. fa. to the sheriff and had it levied upon the same goods, but suffered them to remain in the hands of the debtor.
On the day and year last mentioned, a few hours later in the day, Westley P. Hunt delivered an execution at his suit against Mr. Yan Gleve, and had it levied on the same property by the sheriff and gave orders for an immediate sale. The sheriff accordingly advertised and sold it on those three executions, but it did not bring the amount of Mr. Sterling’s •demand. A rule is now moved on the part of Mr. Hunt, to allow his execution, though the youngest, to' be first satisfied out of the proceeds, on the ground of Mr. Sterling’s having lost its legal priority by means of the foregoing facts.
First, by having delayed the execution of his writ by a voluntary agreement on his part for so great a length of time; that this has forfeited his priority according to adjudications at the common law, in England, as well prior to the year 1776, as subsequently to that period, there cannot be a doubt. But a practice for granting delay *336 on executions has been, used in this state uniformly, not only prior to the year 1776, but it runs back to the earliest period of our juridical history. It corresponds with the memory of the oldest practitioners, and with tradition from their predecessors. Hor has the exercise of it been in a timid or clandestine manner, but openly, by word of *mouth, and by written orders in most cases to the sheriff himself. A practice so old and uniform as this, has now become too stubborn for alteration by any sudden judicial decision, or otherwise than by legislative correction, if correction shall be deemed necessary. And to persist, in the meantime, in the practice, cannot be contrary to the common law, as adopted in our constitution, it being a maxim of that law, that communis error facit jus; a rule becomes law that has been uniformly prevalent for a long and venerable period of time. A practice so old and uniform as this is, would prevail over ancient decisions even in England. Hor do I perceive anything impolitic or injurious in it, to make a legislative alteration therein desjrable. If a creditor chooses to be merciful and patient, so long as a debtor is striving to effect payment of the debt, such forbearance is neither unfair towards the debtor himself, nor is it an obstruction to other execution creditors. They can put an end to this delay at their pleasure by ordering a sale ofo the property, and distribution of its proceeds among the executions, according to priority, as far as the proceeds will extend. Mr. Sterling’s consent not to push the property to a sale on his execution, did not in the least impede Mr. Hunt’s younger writ when he gave the order for an immediate sale; it in effect superseded the agreement of Mr. Sterling for delay. Such agreement is upon an implied condition always, that the execution is not to lose its priority, but the delay granted upon it is to cease, if the sheriff should be compelled to proceed to sale on a younger execution. Delay, in this sense, was never esteemed a badge of fraud in Hew Jersey, however formally *337 it may have been granted. It occurred in the most prominent form in the case of Matthews v. Warne, 6 Halst. 295, and also iu that of Williamson and Snowhill, yet it was not made a ground of decision by the court, in either of those cases. Those prior executions were postponed to younger ones on very different reasons ; and it may be assumed as a rule in Now Jersey, that an agreement to delay the sale of a debtor’s goods is no evidence, by itself, of a fraudulent execution. Therefore we may lay the objection out of the case.
Secondly it is objected, that Mr. Sterling did more than merely to grant delay; that he took away the goods from the ^officer’s control, and so placed them in the hands of the debtor that the sheriff could not have reclaimed them in an action of trover, nor could they be considered in the custody of the law. But the case represents this matter very differently as 1 apprehend it. The taking of an inventory by the officer vested in him a special or qualified title to the goods, according to all the cases of Casher v. Peterson, 1 South. 317; Newel v. Sibly, 1 South. 381; Cliver v. Applegate, 2 South. 480; Wintermute v. Hankinson, 1 Halst. 140; and Lloyd v. Wyckoff, 6 Halst. 220. He became thereby responsible for the property in the inventory, and had a right to place it for safe keeping any where, even in the hands of the debtor himself, as his agent or bailiff, according to the cases of Casher v. Peterson, and Cliver v. Applegate, before mentioned. He accordingly left them in possession of the debtor, and if he did not take security for their forth coming, they remained after levy and inventory at his own risk. All that Mr. Sterling did in the case was this, he “ agreed to suffer them to remain ” till the first of April, 1830, and not to coerce the sheriff in the meantime to sell them. It is not pretended in the case that the goods were at the risk of the creditor. The officer himself was responsible for their forth corning, and might have maintained trover for them upon the ground of responsibility. There is nothing, therefore, iu this objection.
*338 Lastly it is objected that the creditor exacted a rent for the property, equivalent to keeping it of as much value till the expiration of the time, as it was at the time of the levy. Now this shows an intention on the part of the creditor to maintain and pursue his remedy by execution, and removes every suspicion of its being a collusion, either for the benefit of the debtor or in prejudice of other execution creditors. ■ It secured the value of the goods for their benefit, and could not be fraudulent in relation to Mr. Hunt’s execution, which was directly interested in the surplus. It was insinuated that Mr. Sterling intended to keep this rent as a douceur, ■ but this is not found in the case as above stated, and cannot be taken as a part of it. The agreement was made openly, not secretly. The rent proceeding from the goods would be reckoned towards payment of his demand as much as if ■it had arisen from the sale of them. It would be so much made out of them by the execution, which the court *would have applied against his debt, to the extent of what he had received, and that without asking for his consent, let his unwillingness have been ever so great. But the case does not show an unwillingness on his part; on the contrary, it shows a wish to make the goods bring their utmost value. There is no fact more free from collusion with the debtor, or from injuring subsequent execution creditors, than this very one; unless it be that of preserving the goods to their use, against a seizure of them for rent, by exacting security from the debtor, that they should not be distrained by his landlord. While consenting to a lawful delay of sale, Mr. Sterling adopted prudent precautionary measures, with the consent of the debtor, himself, to ensure the utmost value of the goods, and for applying it in . satisfaction of creditors, according to their regular priorities. In this there was no fraud, of either a moral or legal character, nothing that should disturb the priority of his lien, or interfere with the rule of the statute, that the execution “ which was first delivered shall be first executed and satified.” Therefore the rule to show cause must be discharged.
*339 Drake, J. The reasons urged for the postponement of the prior writ of execution in this case are,
First, the delay which took place in selling the property-levied on, and
Secondly, the interference of the plaintiff in the execution of the first writ, and his agreement for the delay of sale.
I concur with my brethren in the opinion that, in New Jersey, every kind of interference or agreement for delay, is not unlawful; hut that there must he some proof of actual fraud, of intention to cover property, or to hinder and delay other creditors, in order to subject the prior writ to postponement. The cases of Matthews and Warne and Williamson and Johnson, were decided on these grounds. We have never adopted the rigid rules on this subject which prevail in England, and in some of the neighboring states ; and I think it inexpedient to do so. In the case of Casher v. Peterson, 1 South. 317, the late Chief Justice has declared the practice and law of this state accurately, as I conceive, except perhaps in the single remark, that the goods are left in the hands of the defendant “ for his "‘benefit and accommodation;” which may possibly mislead plaintiffs to indulge defendants in too free a use of the property levied on, and such as would be hazardous on a question of fraud raised in favor of a subsequent execution.
In the case before us I see no such evidence of actúa! fraud, as should induce the court to interfere; and I consider it unnecessary to express my opinion whether there is any such evidence as would warrant us in ordering a feigned issue, as I understand it to be the agreement of the parties that our decision shall be conclusive.